UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM NALLY, JR. (N51494), | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-1551 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| GHALIAH OBAISI, as Independent Executor of the Estate of Saleh Obaisi, M.D., and WEXFORD HEALTH SOURCES, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Nally, Jr. brings this lawsuit against Wexford Health Sources, Inc. ("Wexford") and the Estate of Dr. Saleh Obaisi ("Dr. Obaisi") (collectively, "Defendants"). Nally contends that Defendants were deliberately indifferent to his chronic abdominal pain in violation of the Eighth Amendment. Before the Court is Defendants' joint motion for summary judgment under Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants Defendants' motion [214] in its entirety.

**Preliminary Matters**

Defendants support some of their factual assertions with general citations to lengthy exhibits. For example, Defendants cite to 300 pages of medical records to support their assertion that Nally was treated 18 times in 2012. (*See* Dkt. 220 ¶ 13.) Nally correctly argues that this practice violates Local Rule 56.1(d)(2), which provides that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." N.D. Ill. LR 56.1(d)(2); *see also Wooten v. Taking Care of Our Seniors, Inc.*, No. 1:17-CV-05570, 2022 WL 1663417, at *4 n.4 (N.D. Ill. May 25, 2022) (Johnston, J.) (citation to 232-page exhibit without specific page number violates Local Rule 56.1). The Court therefore notes its discretion to

1

"disregard any asserted fact that is not supported with such a citation" in addressing the factual background of this case. N.D. Ill. LR 56.1(d)(2).

**Background**

The following facts are undisputed unless otherwise noted.

*1. The Parties*

Nally is an inmate with the Illinois Department of Corrections ("IDOC") at the Stateville Correctional Facility ("Stateville"). (Dkt. 220 ¶¶ 4–5.) Nally began experiencing abdominal pain in 2010, which continues to this day. (Dkt. 226 ¶ 1.) Nally describes his pain level at four on a scale of ten. (Dkt. 220 ¶¶ 9, 42.) He feels abdominal pain at all hours and it occasionally wakes him up. (Dkt. 226 ¶ 2.) Various medical providers, including Dr. Obaisi, have also diagnosed and treated Nally for Type II Diabetes and Hepatitis C, but he does not challenge the treatment he has received for those conditions in this lawsuit. (*See, e.g.*, Dkt. 220 ¶ 8.)

Wexford is a private corporation that contracts with IDOC to provide medical treatment to patients in IDOC custody. (Dkt. 220 ¶ 6.) Dr. Obaisi was a physician employed by Wexford until he died on December 23, 2017. (Dkt. 220 ¶¶ 7, 74.) Dr. Obaisi was the medical director at Stateville during the time relevant to Nally's claims. (Dkt. 220 ¶ 7.)

*2. Nally's Early Treatment and Specialist Visits*

The conduct at issue spans nearly a decade. Nally's pain began in 2010, although the record is thin on relevant events from that year. In 2011, Nally was seen by Stateville medical providers at least ten times for complaints of abdominal pain, during which time he was diagnosed with non-specific abdominal pain, chronic gastritis, cirrhotic liver, and splenomegaly. (Dkt. 220 ¶¶ 10, 11.) At different points during this period, Nally's providers prescribed Zantac, Prilosec, Dulcolax, and Naprosyn. (Dkt. 220 ¶ 11.) Wexford also approved numerous diagnostic tests. (*Id.*)

2

Nally testified during his deposition that he has a sixteen-inch softball sized lump in his abdomen that has grown over the years. (Dkt. 226 ¶ 1.) Defendants dispute the veracity of this testimony, pointing to doctors' notes that found no masses in Nally's abdomen and the lack of any notations in Nally's voluminous medical records indicating such a lump. (*Id.*)

On October 23, 2012, Dr. Obaisi referred Nally to the University of Illinois at Chicago ("UIC") for a consultation with a gastrointestinal ("GI") specialist, a CT scan, and an esophagogastroduodenoscopy ("EGD"). (Dkt. 220 ¶ 15; Dkt. 226 ¶ 4.) Based on that referral, Nally saw a GI specialist at UIC, Dr. Robert Carroll, for his abdominal pain on January 7, 2013. (Dkt. 220 ¶ 17.) Dr. Carroll noted mild reproducible epigastric pain with deep palpation, early evidence of cirrhosis, an enlarged spleen, and symptoms of chronic liver disease. (Dkt. 220 ¶¶ 17–18.) Dr. Carroll did not observe anything that indicated Nally's pain was severe enough to admit him to the hospital. (Dkt. 220 ¶ 18.) Dr. Carroll noted no masses in Nally's abdomen and recommended an EGD to evaluate Nally's pain. (Dkt. 220 ¶¶ 17–18.) Two days later, Dr. Obaisi requested collegial review for Dr. Carroll's EGD recommendations and a colonoscopy. (Dkt. 220 ¶ 19.) Wexford approved Dr. Obaisi's request within five days. (*Id.*)

Four months later, Dr. Obaisi saw Nally again for complaints of abdominal pain. (Dkt. 220 ¶ 20.) Dr. Obaisi noted no acute findings, but that Nally had hepatitis C and cirrhosis of the liver. (*Id.*) Dr. Obaisi prescribed Tramadol and Neurontin, and continued Atenolol and Dulcolax. (*Id.*) Dr. Obaisi saw Nally again in June and July 2013. (Dkt. 220 ¶¶ 23–24). On both occasions, Dr. Obaisi noted that Nally had not yet received an endoscopy at UIC. (*Id.*). Dr. Obaisi continued to prescribe Tramadol, Neurontin, and Dulcolax. (*Id.*) Nally later testified that Tramadol was the only medication that alleviated his abdominal pain. (Dkt. 226 ¶ 13.)

On August 13, 2013, Nally was seen by Dr. Carroll again based on Dr. Obaisi's referral. (Dkt. 220 ¶ 25.) Dr. Carroll ran numerous tests and recommended a follow-up visit in three to four

weeks, along with a different course of therapy. (Dkt. 226 ¶ 10.) Nally contends that the follow up visit never occurred. (*Id.*) Defendants contend that a UIC employee is responsible for scheduling follow up visits. (*Id.*) The parties agree that the next day, August 14, 2013, Dr. Obaisi requested Nally be seen for a GI follow-up visit and on-site EGD, and that Wexford approved Dr. Obaisi's request five days later. (Dkt. 220 ¶ 26.) Dr. Obaisi also continued Nally's Tramadol prescription. (*Id.*) On October 21, 2013, Nally was transferred to UIC for a GI follow-up appointment. (Dkt. 220 ¶ 27.) Dr. Obaisi requested another referral for Nally to go to the UIC GI/Hepatitis Clinic on December 24, 2013. (Dkt. 220 ¶ 30.)

Dr. Carroll testified that the average return time to UIC for a routine EGD is four to six weeks, and that in his opinion, there are issues with inmates' access to adequate follow-up care. (*See* Dkt. 221-3 at 27:7–12; Dkt. 226 ¶ 8.) Dr. Carroll also testified that scheduling follow-up appointments for individuals in IDOC custody presents unique challenges that are not faced by civilian patients. (Dkt. 226 ¶ 8.) He attributes the delay to the logistics of transporting and supervising incarcerated patients and the difficulties of "two large bureaucracies interacting." (*See* Dkt. 221-3 pp. 53–54.)

3. *Dr. Obaisi Takes Nally Off Tramadol*

On August 15, 2014, Dr. Obaisi treated Nally for abdominal pain and ongoing headaches. (Dkt. 220 ¶ 32). Dr. Obaisi did not note any acute findings but noted some cervical pain. (*Id.*) He prescribed Excedrin, ordered an x-ray of Nally's spine, and continued Tramadol (which Nally had requested). (*Id.*) In 2015, Nally was seen five times for complaints of abdominal pain by various Stateville medical providers. (Dkt. 220 ¶ 33.) Nally had been without Tramadol since January 2015, and requested an appointment with Dr. Obaisi and a medication renewal on multiple occasions in early 2015. (Dkt. 220 ¶¶ 33–35.) Dr. Obaisi evaluated Nally on March 10, 2015 and noted his abdomen was soft. (Dkt. 220 ¶ 36.) Dr. Obaisi attempted to prescribe a substitute for Tramadol

4

because Tramadol was a narcotic and not recommended for long-term use (indeed, the Wexford guidelines recommend against its long-term use), but Nally refused. (*Id.*; Dkt. 220 ¶ 77.) Although Dr. Carroll had earlier recommended Tramadol as part of Nally's treatment, he also noted a possible reason to discontinue Tramadol, that is, that it could be aggravating Nally's constipation. (*See* Dkt. 221-3 at pp. 38–39.)

    4. *Nally's Later Evaluations and Treatments*

On December 8, 2015, Nally saw another Stateville physician, Dr. Martija, for abdominal pain. (Dkt. 220 ¶ 40.) Dr. Martija noted that Nally's abdomen was soft, non-tender, and did not show signs of jaundice or icteric sclerae. (*Id.*) Throughout 2016, Nally was seen 16 times by medical providers at UIC and Stateville for his abdominal pain and other GI issues. (Dkt. 220 ¶ 41.) On January 22, 2016, Dr. Martija evaluated Nally for his pain, diagnosed cirrhosis and splenomegaly, prescribed Tramadol, and scheduled a follow-up with Dr. Obaisi. (Dkt. 220 ¶ 43; Dkt. 226 ¶ 15.) In February 2016, Nally was seen by Stateville medical providers five times, including by Dr. Obaisi on February 18, 2016. (Dkt. 220 ¶¶ 44–48.) During that appointment, Dr. Obaisi attempted to prescribe Acetaminophen. (Dkt. 220 ¶ 47.) Nally refused to take the prescription because he said that Acetaminophen did not work for him. (*Id.*) Nally saw a different physician on February 25, 2016, who diagnosed Nally with splenomegaly, chronic low back pain, radiculopathy, chronic abdominal pain, TMJ syndrome without pain, and diabetes. (Dkt. 220 ¶ 48.) That physician prescribed Excedrin, ordered an x-ray of Nally's hip, and referred Nally to the medical director for reevaluation of his back and abdominal pain. (*Id.*)

From March through May 2016, Nally was seen by numerous Stateville medical providers for various ailments, including in some instances abdominal pain. (Dkt. 220 ¶¶ 49–55.) Although Nally saw Dr. Obaisi during this time period, those visits were not for his abdominal pain. (*Id.*) In June 2016, Nally saw another Stateville physician and Dr. Obaisi for complaints of abdominal pain

5

and to review ultrasound results. (Dkt. 220 ¶¶ 56–57). Dr. Obaisi noted that Nally had abdominal bulges, but assured Nally that he would not need surgery. (Dkt. 220 ¶ 57.) On July 14, 2016, Nally saw Dr. Obaisi for complaints of abdominal pain. (Dkt. 220 ¶¶ 58–59.) Dr. Obaisi's review of Nally's previous ultrasound indicated hepatosteatosis (fatty liver disease) but no kidney stones. (*Id.*) Dr. Obaisi prescribed Bentyl and ordered another ultrasound, which Wexford approved, to rule out cholelithiasis. (Dkt. 220 ¶ 59.) Numerous providers saw Nally in November 2016 for his pain. On November 10, 2016, Dr. Obaisi requested a collegial review for a HIDA scan of Nally's gallbladder, and Wexford approved one week later. (Dkt. 220 ¶ 62.)

In June 2017, Nally saw another GI specialist at UIC. (Dkt. 220 ¶ 64.) That specialist, Dr. Gannavarapu, performed an ultrasound on Nally's epigastrium and could not determine whether there were any abnormalities, so he requested Nally return in six months. (Dkt. 220 ¶ 64.) In July 2017, Dr. Obaisi requested, and Wexford approved, a CT scan of Nally's abdomen at UIC. (Dkt. 220 ¶ 68.) Nally had a CT scan a few days later, and in an August 7, 2017 follow-up appointment Dr. Obaisi informed Nally that there were no acute findings. (Dkt. 220 ¶ 68–69.)

On December 11, 2017, Nally saw Dr. Gannavarapu at UIC again—around six months after his first visit. (Dkt. 220 ¶ 72.) Dr. Gannavarapu recommended a trial of Bentyl and Levsin for pain and recommended a follow-up with UIC's liver clinic. (*Id.*) The next day, Dr. Obaisi requested a referral to UIC's liver clinic, which Wexford approved. (Dkt. 220 ¶ 73.) Dr. Obaisi passed away on December 23, 2017. (Dkt. 220 ¶ 74.) On January 26, 2018, another medical provider renewed Nally's Tramadol prescription. (Dkt. 226 ¶ 16.)

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "As the

'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). When determining whether a genuine dispute as to any material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022).

**Discussion**

Nally alleges that Dr. Obaisi acted with deliberate indifference to his serious medical needs under 42 U.S.C. § 1983 and that Wexford is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), for having a custom, policy, or practice that violated the Eighth Amendment's protections against cruel and unusual punishment. The Court addresses each defendant in turn.

*1. Dr. Obaisi*

The Eighth Amendment requires prison officials to provide at least a base level of medical care to inmates in their custody. *See Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Eighth Amendment's floor for constitutional care is roughly defined by the case law. To prevail on his claims against Dr. Obaisi, Nally must show that Dr. Obaisi acted with deliberate indifference to his objectively serious medical need. *See Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (citations

7

omitted). Nally must prove both an objective element (whether his abdominal pain is a serious medical need) and a subjective element (whether Dr. Obaisi acted with the requisite state of mind). *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *see also Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (to prove the subjective element, "a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk").

As a threshold matter, Dr. Obaisi argues that Nally's claims fail because he cannot prove the objective element. Nally argues that his chronic abdominal pain can constitute a "serious medical need" because he has been experiencing it for twelve years and feels pain every moment he is awake. The Court agrees with Nally. Chronic pain can, even standing alone, constitute an objectively serious medical condition. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). "Even when the only evidence for a party's position is 'self-serving,' so long as it is based on personal experience, it is sufficient to defeat a motion for summary judgment." *Greyer v. Allen*, No. 3:20-CV-50014, 2023 WL 6847068, at *7 (N.D. Ill. Oct. 17, 2023) (Johnston, J.) (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)). Here, Nally's claims of persistent abdominal pain are enough to create a genuine dispute about whether he suffered a serious medical need.

A reasonable jury could find that Nally's abdominal pain is a serious medical condition. Defendants separately argue, however, that no jury could find that Dr. Obaisi was deliberately indifferent to Nally's abdominal pain. As the Seventh Circuit has instructed, this is an exacting standard: "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (citation omitted). The core of Defendants' argument is that Nally's claim is nothing more than a disagreement with Dr. Obaisi's reasoned

8

medical judgments. Nally responds with three theories that he says bring Dr. Obaisi's treatment beyond mere disagreement to deliberate indifference. The Court addresses each in turn.

### a. Failure to Follow Specialist Advice

Nally first argues that Dr. Obaisi was deliberately indifferent to his abdominal pain because he failed to follow Nally's GI specialist's advice. A plaintiff may meet its burden at summary judgment by presenting evidence that his medical provider did not follow specialist advice. *See Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004). On the other hand, medical professionals are afforded discretion under this analysis, and neither mere disagreement about treatment nor negligence or mistake is enough to support a deliberate indifference claim. *See Taylor v. Wexford Health Sources, Inc.*, No. 16-CV-3464, 2022 WL 4329025, at *9 (N.D. Ill. Sept. 19, 2022) (Blakey, J.) (collecting cases).

Nally contends that Dr. Obaisi caused a seven-month delay between Dr. Carroll's recommendation that Nally receive an EGD and Nally's EGD, and that Dr. Obaisi never scheduled a follow up visit with a GI specialist after Dr. Carroll recommended one in August 2013. Defendants respond that the uncontested facts show that Dr. Obaisi did exactly as Dr. Carroll recommended, and that any delay in the implementation of Dr. Carroll's recommendations had nothing to do with Dr. Obaisi's provision of care. The Court agrees with Defendants.

The agreed facts show that Dr. Obaisi was immediately responsive to Dr. Carroll's recommendations. Dr. Obaisi answered Dr. Carroll's first recommendation within two days by requesting Nally have an EGD at UIC. (Dkt. 220 ¶ 19.) Nally admits this point, and further admits that Wexford approved Dr. Obaisi's request five days later. (*Id.*) Nally argues that Dr. Obaisi failed to follow Dr. Carroll's prescription recommendations, and without citing support from the record, that no follow-up visit occurred after Dr. Carroll's second recommendation. *See* Opp. at 4. But Nally admits that Dr. Obaisi requested he be seen by a GI for a follow-up and on-site EGD the day after his August 13 appointment with Dr. Carroll, that Wexford approved Dr. Obaisi's request just

days later, and that Dr. Obaisi continued Nally's Tramadol prescription as recommended by Dr. Carroll. (Dkt. 220 ¶ 26.) Indeed, Nally admits he was transferred to UIC for GI follow-up in October 2013. Nally presents the Court with no evidence that Dr. Obaisi was able to do more to implement Dr. Carroll's recommendations beyond what Dr. Obaisi undisputedly did. This is fatal to his argument. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019) (affirming summary judgment for defendant where, "although there were clearly delays in [plaintiff's] treatment, the evidence suggests Dr. Obaisi did what he could within the limits of his role to move the ball forward . . . nothing in the record suggests that Dr. Obaisi's actions or inaction caused any of the scheduling delays with [plaintiff's] appointments at UIC").

The Court is sympathetic to Nally's frustration with the delays between his referrals and appointments with his medical specialist. However, as Dr. Carroll testified, certain delays are inherent in the UIC referral process given the unique challenges of coordinating between the many parties required to provide inmates with off-site specialist care. (*See* Dkt. 226 ¶ 8.) As Dr. Carroll explained in his deposition, Nally's delay was likely the result of "two large bureaucracies interacting with difficulty with each other." (*See* 221-3 at 53:4–54:7.) Regrettable as that system may be, it says nothing about whether *Dr. Obaisi* followed Nally's specialist's advice. In each instance that Nally raises, Dr. Obaisi followed Dr. Carroll's advice nearly immediately. Nally's first theory of liability is untenable given the undisputed facts of this case.

### b. *Needlessly Delaying Care*

Nally next argues that Dr. Obaisi was deliberately indifferent to his abdominal pain by needlessly delaying his care. "A delay in the provision of medical treatment for painful conditions— even non-life-threatening conditions—can support a deliberate-indifference claim." *Grieveson*, 538 F.3d at 779. When courts consider a deliberate indifference claim based on delay, "we ask how serious the condition in question was, how easy it would have been to treat it, and whether it

10

exacerbated an injury or unnecessarily prolonged pain." *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021). To rise to the level of deliberate indifference, "[d]elay need not be extreme; failing to provide a very easy treatment or accommodation can suffice, if unnecessary suffering resulted." *Id.* The Court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

Nally cites testimony by Dr. Carroll and Dr. Carter to support his argument. But Nally stretches that testimony too far. Nally argues that Dr. Carroll testified "that there are issues with inmates' access to medical care and that [inmates] are not provided adequate follow-up care." Opp. at 5. Nally again fails, however, to connect those issues to Dr. Obaisi's care for Nally in this case. As discussed above, Dr. Carroll's statements were made in the context of systemic issues between UIC and IDOC. Nally also argues that Dr. Carter "found it concerning to learn that Mr. Nally had been experiencing abdominal pain for nearly two years back in 2012." Opp. at 5. This statement omits that Dr. Obaisi's earliest conduct at issue occurred in October 2012. Nally does not argue that Dr. Obaisi took too long to refer Plaintiff to a specialist. Instead, Nally notes that he "complained to *other* medical providers at Stateville … for years." Opp. at 2. Dr. Carter's cited testimony, like Dr. Carroll's, does not shed any light on Dr. Obaisi's specific treatment of Nally—certainly not enough to show that Dr. Obaisi knew of a serious risk to Nally's health and consciously disregarded it. *See Holloway*, 700 F.3d at 1073.

Defendants point out that Dr. Obaisi saw Nally seven times for abdominal pain from 2011 to 2017 and referred Nally for off-site care nine times. Nally counters that the number of visits or referrals, on its own, does not shield Dr. Obaisi from liability. Nally is right about that. But here, Nally's argument moves from the timing of Dr. Obaisi's care to its substance. In making this shift, Nally does not adequately explain why Dr. Obaisi's care (regardless of its frequency) was constitutionally deficient. There is no evidence that Dr. Obaisi refused to see Nally, or that he

11

delayed appointments or referrals. Dr. Obaisi ordered ultrasounds, x-rays, CT scans, EGD scopes, colonscopies, endoscopies, labs, and a HIDA scan. He referred Nally to two different GI specialists at UIC multiple times. He made various diagnoses and prescribed various corresponding medications. This evidence of continued care cannot be characterized as deliberately indifferent without more to contradict it. *See, e.g.*, *Lor v. Kelley*, 436 Fed. Appx. 634, 637 (7th Cir. 2011) (affirming summary judgment for defendant where defendant "prescribed and adjusted [plaintiff's] antibiotics … performed relevant examinations and laboratory tests … sought outside advice about a specialist referral from the Medical Review Committee" and followed the committee's advice); *Harrison v. Wexford Health Sources, Inc.*, 669 F. Appx. 797, 799 (7th Cir. 2016) (affirming summary judgment for defendant where, "[d]uring [] 17 months [of treatment without a referral], Dr. Obaisi regularly altered [the inmate's] prescriptions for pain-relieving, anti-inflammatory, and muscle-relaxing drugs based on [the inmate's] condition. Dr. Obaisi also ordered and reviewed [the inmate's] MRI to ensure that he properly diagnosed his injury. Because the record does not contain evidence showing that Dr. Obaisi's care violated professional medical standards, the district court properly granted Dr. Obaisi summary judgment.").

Dr. Obaisi's diagnoses and prescriptions also accorded with those made by other physicians. In short, there is no evidence in the record that Dr. Obaisi's conduct diverged significantly enough from accepted medical judgment to meet the high deliberate indifference standard. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.") (quotation omitted).

The Constitution does not require that Dr. Obaisi cure Nally's chronic pain, only that he provide adequate medical care in response to that pain. On this record, no reasonable jury could

find that Dr. Obaisi (rather than other unnamed non-parties) needlessly delayed care for Nally.[1] Nor could a reasonable jury find that the substance of Dr. Obaisi's care was not actually based on medical judgment. Nally cannot succeed on his second theory of liability.

### c. Withholding Pain Medication

Finally, Nally argues that Dr. Obaisi acted with deliberate indifference by withholding Tramadol. A defendant cannot avoid liability merely by showing that they provided some treatment—even a lot of treatment—if a fact question remains as to whether that treatment was constitutionally deficient. *See White v. Woods*, 48 F.4th 853, 862–63 (7th Cir. 2022) (holding that a jury could find deliberate indifference even though plaintiff "was seen at least fifteen times for his knee pain, was prescribed different medications, received several X-rays, [and] had physical therapy"). A plaintiff can show deliberate indifference by presenting evidence that a defendant "persiste[d] in a course of treatment known to be ineffective." *Snow v. Obaisi*, No. 1:17 CV 4015, 2021 WL 4439421, at *9 (N.D. Ill. Sept. 28, 2021) (Blakey, J.) (citing *Whiting*, 839 F.3d at 662). Again, though, mere negligence is not enough. A plaintiff must show a "substantial departure from accepted professional judgment" such that the defendant's decisions were not based on such judgment. *Id.* (citations omitted).

Dr. Obaisi prescribed Nally Tramadol at least as early as April 2013 and continued to renew the medication through 2015. Dr. Obaisi took Nally off Tramadol in 2015 and kept him off for most or all of 2016 and 2017. Nally testified that Tramadol was the only medication that worked to alleviate his pain. From this, a jury could reasonably conclude that Nally's other treatments were less effective than Tramadol. *See Payne*, 337 F.3d at 772–73 (self-serving evidence alone may be sufficient to defeat summary judgment if based on personal experience and supported by specific

---

[1] The Court does not suggest that the other unnamed medical providers treating Nally's early pain were deliberately indifferent to it. Instead, the Court raises this point only to show that Nally cannot use this instance of alleged delay to prove that Dr. Obaisi was deliberately indifferent to his abdominal pain.

13

facts). But that is not enough, on its own, to show that Dr. Obaisi was deliberately indifferent to Nally's abdominal pain. Nally must do more than show a different treatment decision could have been superior—he must show that Dr. Obaisi's decision to take him off Tramadol was "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Defendants rightly object that Nally is not a medical doctor. Neither is the Court. All the medical evidence in the record on this issue supports Dr. Obaisi's treatment decision. Although Dr. Obaisi took Nally off Tramadol in 2015, he continued to treat Nally's abdominal pain, ordering tests, referrals, and alternative medications and other interventions. Although Dr. Carroll originally recommended Tramadol for Nally, he also testified that Tramadol could have been aggravating Nally's gastrointestinal issues. The Wexford medical guidelines on narcotic drugs recommend against their prolonged prescription. And Nally himself testified that he understood the opiate crisis and that it is not a goal of pain management to keep a patient on pain medication indefinitely. (*See* Dkt. 215-1 pp. 74–75.)

Whether or not Dr. Obaisi's decision to take Nally off Tramadol was the right or best one, he is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under these circumstances." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). No evidence presented could support that finding; indeed, it supports the opposite. Nally's third theory cannot survive summary judgment.

Defendants have shown that there is no dispute of material fact as to Dr. Obaisi, and that Dr. Obaisi is entitled to judgment as a matter of law. On the facts before the Court, Nally cannot prove that Dr. Obaisi acted with deliberate indifference to his abdominal pain. Finally, because Nally cannot prove Dr. Obaisi acted with deliberate indifference to his serious medical need, the Court need not address the parties' arguments on causation.

*2. Wexford*

Nally makes no argument whatsoever in support of his *Monell* claim against Wexford. He has therefore conceded Defendants' arguments. *See Myers v. Thoman*, No. 1:09-CV-0544-JMS-DML, 2010 WL 3944654, at *4 (S.D. Ind. Oct. 6, 2010) ("The Seventh Circuit has clearly held that a party who fails to respond to points made upon a motion for summary judgment concedes those points.") (citing *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003)). The Court agrees with Defendants too. There are three ways to hold an entity responsible for a constitutional violation under *Monell*: if there is "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Fields v. City of Chi.*, 981 F.3d 534, 562 (7th Cir. 2020) (internal citation omitted). There is simply no evidence in the record (and no argument by Nally) to support any of these theories of liability. As Defendants point out (1) the Seventh Circuit has held Wexford's offsite referral policy is constitutional, *see Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021) (Wexford's "collegial review is not unconstitutional on its face. We held as much in *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 659 (7th Cir. 2021)."); (2) there is no evidence in the record of any widespread practices or customs related to Wexford; and (3) Wexford never denied any of the recommended services or referrals made by Nally's doctors. Consequently, Nally's *Monell* claim against Wexford cannot survive summary judgment.

15

**CONCLUSION**

For these reasons, the Court grants Defendants' joint motion for summary judgment [214] on all counts and dismisses this case with prejudice.

**IT IS SO ORDERED.**

Date: 11/28/2023

SHARON JOHNSON COLEMAN
United States District Judge